Good morning, Your Honor. I'm Caroline Brown for Appellants. I'd like to reserve three minutes of my time. Ms. Brown, yes, thank you. Appellants are the agencies and individuals responsible for administering the Medicaid program in the State of New Jersey. Fifty cents of every dollar spent in New Jersey on Medicaid is funded by state taxpayers, and the other fifty cents of every dollar is funded by the federal government, subject to strict compliance with federal rules. Appellants have a responsibility to state taxpayers and to the federal government to ensure that every dollar spent is accounted for and justified. And this responsibility extends to the $100 million worth of supplemental payments that are paid every year to federally qualified health centers. The district court's decision thwarts the state's efforts to apply program integrity rules to the FQHC supplemental payments. There are many ways in which Medicaid treats FQHCs as favored providers. Many of these provisions are reflected in FQHCs, federally qualified health centers, the appellants, the appellees in this case. Hospitals? They're not hospitals. They're health centers. They're health centers. Federally? Federally qualified health centers, FQHCs. Could you get to the heart of the matter? What is the beef in this case? The beef in this case is that the state has requested that the FQHCs provide information to support their claim for supplemental payments from the state. The nine fields that were discussed before Judge Pisano? Yes. And that's the subject of the injunction? The injunction prevents the state from requesting this information, and it prevents the state from conditioning the payment of the supplemental payment. Having reviewed primary cares briefs, does it appear they don't really contest any of those fields? Well, at least seven of them. And there are two that I think they suggest that they don't have a big problem with those two. They don't contest seven of them, although the district court did enjoin all nine. They don't contest seven of them. They do contest two of them. When was that conceded, the seven? During this appeal? It's conceded in the brief. Okay. It's also fairly clear to me that they're not really contesting the two. Rather, they are raising the two to say that payment should not be the proxy for Medicare eligibility. I think it's two issues, Your Honor. I think they are contesting asking for those two pieces of information on the grounds, they say, not that it's prohibited by federal law, but that it is not consistent with the state plan or with state regulations. Let me interrupt you just a second. Correct. Just a second. What are the two fields? The MCO payment date and the MCO payment amount. Date and amount. Yes. Easy stuff. You would think so. You say it should be a proxy for determining Medicare eligibility. And your friends say, no, payment should be a proxy. We say that a supplemental payment is what the statute describes it as, a supplement. It is a supplement to the MCO payment. Yes. And we believe both the Fourth Circuit and the First Circuit have accurately described the payments that the FQHCs are entitled to as coming from two places, payment from the MCO and then the state's supplement to that payment. Well, now, just maybe getting right into the specifics. Your adversary points out that there are certain things, and they're detailed actually in the appellee's brief on 26 and 27, covering physician on days when the PCP is sick, bungling, I guess, could be taken out of that equation, services of a single provider in two different locations. Those don't meet the definition of a Medicaid covered encounter, right? Isn't that a hole in your argument? A hole in my argument? Yes. No, I don't believe so, Your Honor, because the Medicaid, the HMOs are responsible for making the Medicaid payment to the FQHCs. The state has paid them. The state has paid the MCOs to be responsible for making those payments. But those types of things the MCO is not going to pay, right? If it is a Medicaid-covered service, the MCO is obligated by contract to pay. If the MCO has made an error, and they should have paid and they didn't, there is an appeal right within the MCO to get that payment. But isn't that really the issue here? You can see that the MCOs deny payment for reasons unrelated to Medicaid. Mistakes can be made. Mistakes can be made, and there is a process to address them. Isn't the real issue here, the law side, is that the parties need to work out a way to eliminate that problem. They need to work out a way to promptly ex post, verify, and reconcile only those claims reasonably in dispute. Yes, Your Honor. The district court decision prevents the state from collecting the information, and it prevents the state from conditioning the supplemental payment on the MCO payment. But if you agree with me that that really is the issue, Judge Bozzano ordered that the parties reason together to try to resolve this dispute. Just have those discussions progress. There have been discussions in process. They have been more focused on post-payment auditing review and the sharing of information. But, Your Honor, we believe the record shows that repeatedly the state has said to the FQHCs, give us the instances in which you believe you are not receiving prompt payment from the MCOs so that we can help you resolve those situations. That is repeated time and time again. Time is the issue here. Your policy is zero. In other words, when the HMO doesn't pay, you say we're not going to pay. Yes, and we believe that is completely consistent with the statute. Is it we are not going to pay unless we get this additional information? In other words, the date of payment or the date of no payment? Yes, and a no payment, a $0 payment, the state still considers that to be a payment, a payment of $0, for instance, in a bundled payment type situation. And then you ask for these two additional items. Yes. Which were again? The MCO payment amount and the MCO payment date. But we're talking about a no payment. The payment would be zero. Now, why can't you just go back over to the HMO, which is under contract with the state, and say, why did you refuse to make that payment? Yes, and if the state had the information, which it has been enjoined from being able to collect, the state could go back to the HMO. Why are you enjoined? Let's go back a second. The HMO knows why it denied payment. So you can go back to the HMO and say, why did you deny that payment? So you'd have an answer to your question. Because right now the system that's in place and the system that the district court has required the state to follow is the state basically gets a claim from the FQHC, not for a particular service, but for a bunch of money that they have to pay. But is there anything preventing the state? Let's put the district court decision aside for a moment. Is there anything preventing the state from asking the HMO, with whom it has a contract, to provide it with information as to the date that the claim was denied and the reason? Yes, and the state has that information based on the account for data that the HMO has provided. If you have that information, you can use that. Why do you need it from the hospital? That's exactly the problem, Your Honor, because the state, when it asked for the information from the FQHCs, it got information that the fields were not filled out correctly or they were not. It couldn't be used. When the state tried to use the information that was provided by the FQHCs, it ended up with a low supplemental payment. Instead, it said, let's use the encounter data from the HMOs. Let's use the HMO data to generate the supplemental payment, which did result in a higher amount, and that is what led to the plaintiffs coming into court and asking for the injunction. It's a zero assessment. It's not, obviously, as I see it, etched in stone. It's a zero because at the moment it's presented, it's not a qualified Medicaid reimbursable encounter, I guess is the word. Yes. Is that fairly accurate? But it can change, right? It can change, but it depends. What the plaintiffs are asking for here is that if they don't get paid from the HMO, and they might not get paid for an invalid reason, or they might not get paid for a valid reason. It doesn't matter. They want the state to pay for it, and the state has a responsibility to make sure that it is not paying for the same service. They want you to pay, irregardless of whether it's a Medicaid-eligible encounter. Well, no. What they would say, Your Honor, is we only want payment for a Medicaid-eligible encounter, but we decide. We, the provider, decides, and that is not the way that it works in Medicaid. The state should decide what is eligible or not eligible, and in the case of managed care, the managed care company decides what is eligible and not eligible. It's not that terribly hard to do. I mean, you have grids, squares. You have charts. You have all of those things that tell you this is an eligible Medicaid encounter or not. Yes, and what do you need to do that? You need information. That is the problem. So is the beef really just going to be too costly to get to that kind of minutia? No. The state wants it. The state gets it from every other provider. The state needs the information, and it needs to be able to say our contractors, the HMOs, who we have paid to provide the service are the first step in deciding whether or not this is an eligible encounter. But you certainly can determine that by asking the HMO. You can, Your Honor, and the state used the MCO data, and that's what led to the preliminary injunction. You say you're not responsible at the PPS rate if the MCO has failed to make a prior payment for any reason, right? Yes, because our responsibility is to make, number one, to oversee the MCOs, to pay the MCOs, to make sure that the MCOs are complying with their contract, and then to supplement the MCO payment, including a $0 payment when that is appropriate. But there are good reasons why an MCO would fail to make a prior payment, as well as make a payment. Right. They may not get billed. They might have already paid. It might not be a Medicaid beneficiary. It might not be a Medicaid-covered service. It might not be a Medicaid financial provider. And that's why I have some difficulty with your friends across the aisle, basically. The payment information is useful and relevant, whether or not it's a proxy, whether or not it is the proxy. It is relevant information in some of those things you've just articulated. It is relevant information. It is required by the federal government, and it is part of the state's efforts to make sure that every dollar that it receives is verified and documented. Just one sort of housekeeping matter. On page, well, A13 of the appendix, the district judge concluded that Medicaid regs in the NJAC are federally approved. Is that true, or is it only the state plan that's federally approved? No, the state plan, can I give a little longer answer? I know my time is up. The state plan, which is the document between the federal government and the state government. Yes. That's what's federally approved. That's federally approved. The state regulations are not federally approved. Okay. Thank you. What's the most expeditious way for you to get this information, so that you can make the decision that you have to make so that primary care gets paid? Well, Your Honor, what the state, the most expeditious way is the way that the state tried to do it, which is to ask the FQHCs for the information, and then they use that information to process the. Now, I would assume, I don't know. So much of this is new to me. But I assume they had the information because when they submit a claim to an HMO, the HMO says, no, zero, and here's the reason. Is that the way it works? Yes. Yes, they should have that information. Now, the state, at the same time, is also getting information from the MCOs about encounters, encounters from FQHCs, encounters at hospitals, encounters for all of their providers. And part of the problem here is that the state was getting conflicting reports. They could not be reconciled. Each time primary care gets a rejection, it can just simply pass on that rejection to you and give you the date and the reason. The date and the reason. And if it is an invalid reason, then the proper course is for the state to work with the HMOs to make sure that those claims are paid. All right. Maybe they'll have a response to that. Thank you, Ms. Brown. Ms. Gelati, pronounce that correctly? Good morning, Your Honor. I'm Kathy Gelati. Gelati. On behalf of the New Jersey Primary Care Association. Can I jump right in just to see if we are on the same page with this? Do you really object to the state's collection of the MCO data field, the payment and date per se, or do you just object to the policy of making wraparound payments contingent on prior MCO payment? The problem with the MCO payment fields, the two fields, eight and nine, that are at issue in this case, is that they're not just documentation requests. The state is using those payment fields in order to make a determination as to whether or not to pay. So it's not, your objection is not to giving them the information. The objection is to having seminal critical importance attached to the fact. To using it as a prerequisite, because we have a concession in the course of the proceedings below, that there are instances in which HMOs deny valid Medicaid claims. So if you don't object to the collection of data, rather just having it used, having the payment used as the sine qua non, for lack of a better phrase, I think I sense an agreement that the state's entitled to collect the data on a quarterly basis. The problem is what is the purpose for that data collection? That's a separate question. And the state has not operationalized what it's going to do with that information. It's incumbent on them. As the single state agency under the Medicaid Act, they're the ones that have to design a system to make supplemental payments in accordance with federal law. But this started in 2004. I see people trying to work this out. The process really started in trying to work together in 2004. This is 2013. Would you agree that you're really not that far apart? I'm not sure, Your Honor. I know exactly the record sites that you're referring to about the parties trying to work together, but they also show that the state has been on notice since 2004 that there are significant discrepancies between MCO data and what the FQHCs have in their records. Would you agree that the payment, 8 and 9, the payment information, even if it's not dispositive, is useful, relevant, to condensing those claims in dispute? It could be useful, but it should not be dispositive. That's what I'm saying. But the problem is that we have in the record, we have a couple of declarations that discuss the issue of this bundled payment. So when the MCOs, they make, it can be a global fee, a bundled fee, whatever you want to call it, for a series of visits. They pay once. The FQHCs are entitled to a supplemental payment for each component of that bundling. And the state has not designed a system that will make an appropriate supplemental payment. But isn't that really what is at issue here, finding a way by which the state can verify and reconcile claims reasonably in dispute? The state already has been on notice, and they've conceded that this is an issue. This is a gap in their system. Isn't this really the issue in the case? This is the heart of the case. But it's also the state's obligation to design a system that addresses the fact that MCOs, under federal law, there's a complex statutory scheme here. Under federal law, MCOs, their only obligation vis-a-vis the health centers is to make payment to the health centers under 42 U.S.C. 1396 B.M. 2A, Romanette 9. And what that provision says is that we're going to pay the FQHCs not less than what we pay other providers, other non-FQHC providers for similar services. And the reason why Congress put that statutory provision into place was to protect the FQHCs in the Medicaid managed care... Of course, it's for qualified encounters, and isn't that... Of course, and we're not contesting, but the HMOs are not looking at whether the encounters are qualified. They're not making a determination. It depends on what kind of... I thought they were. I thought they were interested in making sure that you're eligible, and if you're eligible, we'll pay. If you're not eligible... But in the bundling situation, all of those visits that comprise the global series... So we had a reference in the record to dental prosthetics, for example. There's a series... A patient comes in for a series of visits. The HMO pays a single time, and that's perfectly appropriate, because that's how the HMO pays other non-FQHC providers. So under federal law, that is okay. But it's the state's obligation to make a wraparound payment for each component of that, and it has nothing... But doesn't it do that when the treatment is concluded? But with the way the state has designed the nine-field system, is that they only will make... So there'll be a zero payment for... Let's say there's a series of 10 visits that the health center has provided. The HMO only pays one time, so there's a series of zeros under the MCO payment date and MCO amount, and that would never trigger... What about Ms. Browns, if I understood her correctly? If we don't make a payment that you're entitled to, there is a review process. Is there really a review process? But see, there won't be. There's no review for when an HMO has denied a bundled claim like that. Is there a process for you to swap if you think someone's owed money? To swap to whom? To the state? Yeah. Not under this nine-field process. I mean, there might be some back and forth, and the health centers will try to protect their interests, but there's no process that was contemplated that's in that nine-field, the letter that they sent out in September of 2011. So if there's a real process, you'd be satisfied then? Well, if... But why not design a system from the get-go? If you know that this is a problem, if you've been trying to work with the health centers, as Judge Barry said, since 2004, why would you design a system that does not address such a glaring discrepancy? Is that your biggest problem? Where you have one individual that has several encounters, and you're not paid until the last encounter? Our biggest problem is that the state has conceded that there are... It was aware of instances where valid Medicaid claims would not get recognized by the HMO. That's what I've been trying to say. Isn't that the narrow field of things that remain in dispute? How do we most expeditiously review those? Not we, but... Design... Designing systems sounds so important, and I'm talking about... There is an obligation under federal law, Your Honor, to have a system that makes appropriate payment for these services. But aren't there already regulations and statutes that allow the state to ask for verifying information? For verifying information, for ordinary documentation. But the information that they're going to get from the health centers, when they put down zero, because it was a bundled claim, that's... It was in denial. There'll be... The state has not come up with a way to go ahead and make a supplemental payment. But it's not the case that they never pay those claims, is it? It's a claim... Isn't it the case that those particular claims are delayed, as opposed to never being paid? In the bundling situation? The state has acknowledged that it has an obligation to make those payments. That was in a letter that the state had written us, but they never came up with a way to operationalize that obligation. I understand every dollar is important, but how big is this problem? I mean, is this... Are you able to assign a percentage? It's a huge... I mean, most of these health centers are... For a lot of them, Medicaid is a huge component of their patient load. But this particular problem, I mean, is this... You know, 5% of the claims will be caught in a zero? It can be as much as 10%. Okay. We had one declaration in the record from CAMCARE saying as many... As much as 10%. Can I ask you just a general question? Is there any federal or state prohibition against claim-level review? There's not, is there? No, Your Honor. Against the claim-level review, no. But these claims will never get reviewed. I understand. If you were writing the plan, I imagine you wish you could write the plan. I'm not so sure. If you were writing the plan for the state so that you can get paid and the state can get the information that it needs to make the payment, what would that plan be? I think there would be... What has the state been doing for the last 10 years before they made this change in policy? That was perfectly acceptable. You know, health centers submit... I always think of accountability and it seems to me that that's what they're trying to get at. They want to make sure that they're paying claims that are Medicaid eligible. On the fee-for-service side, health centers work directly with the state and they submit their claims and there's the ordinary type of certifications that the health centers make. There is a federal regulation addressing what constitutes a valid Medicaid encounter under 42 CFR 405.2463, which is a valid face-to-face visit between a health center patient and certain types of providers that the health center has. Would it be the case that an MCO is assigning a zero payment to a certain claim and maybe for the same patient several zeros, and it ends up that... And your position is that the state should pay that, irrespective of the zero. If it's a valid Medicaid service, just by virtue of the fact that... Wait a minute. The zero would suggest that it's not. It depends on why the zero is there, Your Honor. If the zero is there because the MCO happens to pay on a bundled basis, but it's still a valid Medicaid service, then yes, the state has an obligation to make a supplemental payment. And as I keep saying, there's a complex statutory scheme here. There are FQHC payment protections that are at stake and all we're saying is that the state needs to devise a system that goes ahead and makes payment to protect the health centers. Well now, Judge Bozzano ordered that defendants submit a plan of action to the court to implement a payment system applicable to plaintiff's member health centers that is compliant with federal law for the court's approval within 180 days of the entry of this order. Was any such plan ever submitted? Your Honor, there's been a preliminary plan that the state has submitted in December of 2012. And now they're working on a revised 13th field plan. Well, that's kind of interesting, isn't it? I mean, that's kind of what I've been saying from the beginning. If you have this, if you can work together on this plan... We have not worked together, Your Honor. Well, if you can and come to some sort of agreement, doesn't all of this stuff go away? It could, but it hasn't worked out that way. We've had an opportunity to comment on some aspects of what the state has presented, but we've really been presented with a fait accompli. Well, I think we might ask Ms. Brown about that when she gets back up. I have one question that's been bothering me, and the state didn't raise it, which somewhat surprises me. Why do you have a private right of action to enforce the Medicaid Act's requirement that a state submit any change to its plan to the federal government? I mean, is this really a rights-creating provision? I mean, there has to be an unambiguously conferred right to support a cause of action under 1983. Gonzaga's very clear on that. Yes, yes, Your Honor. The fact that there is a violation of 1983 for a Medicaid statute, and the supplemental payment requirement has been recognized by many courts, but with respect to... A right we found en banc in the Penn Pharmacist case, there was no private right of action as to a related provision of the Medicaid statute. Yes, Your Honor, but this supplemental payment statute has been enforced by health centers across the country under 1983. Maybe they're wrong. I asked this before, and let me ask it. Maybe it's a different way, but the state does have procedures to appeal denials of supplemental and wraparound payments, and I gather from your argument that those appellate procedures are not sufficient to satisfy your concerns. No, Your Honor, and under 1983, we don't need to do any sort of exhaustion. Why would those procedures not be sufficient to satisfy your concern? Because the volume of it could be... To request a fair hearing on a claim-level basis, it's not practical for the health centers to do it that way. What do you mean, not practical? Well, every time the state denies... You can't do, pardon the use of the word, bundled appellate cases? I think the fair hearing process would allow a grouping of common claims, but the point is that they have acknowledged that these payments are not getting made and they should be made to the health centers, but yet they haven't devised a system that accomplishes that. We're right back to the way we started out. A system, that's all we need, just a system to resolve those disputed claims or to validate the ones that were denied, and I hear today that there has been a plan proposed in December 2012 and it's been submitted and they're amending it and you don't agree with it, but it sounds like that men and women of goodwill can work together to work this out. But the plan is really no different from what was submitted before. Instead of now nine fields, they've gone up to 13. So you're saying we should do an opinion now addressing all of these issues. I don't know if everybody wants us to do an opinion here. There are a lot of issues and a lot of issues can go either way. Well, if your honors keep in mind that there is an overarching statutory scheme to how this is supposed to work and that's meant to be protective of federal payment rights, a scheme that's been in place since at least 1989, I think your honors would be inclined to, we would ask you to affirm the district court's opinion. Thank you, Ms. Galati. Ms. Brown. Your honor, first I'd just like to get the bundled payment issue out of the way. On page 15 of our reply brief, we quote the instructions from the state to the centers that make a distinction between a $0 payment in a bundled situation and a denied claim. I think we're worried about all the other situations. The bundled, I guess you've dealt with. Of course, it's the bundled that is always brought up as the example. Now there may be other situations and the FQHCs have the same right as every other provider to appeal within the HMO to try to get that resolved and if they still believe after that appeal that they have been denied a payment for a valid Medicaid claim, they can file a claim for supplemental payment and they have a right to appeal the denial of a supplemental payment through that system. It's kind of cumbersome. I get the impression from Ms. Galati to have to take this one case, you deny a payment, you have to appeal that, it's expensive, maybe it doesn't involve that much money. Then you have to go back again and back again and it's not cost effective. Yes, but the question, Your Honor, that the district court held and that the plaintiffs are asking you to hold is that federal law prohibits the state from saying we're only making supplemental payments, supplement to the MCO payment. There is nothing in federal law that excuses the FQHCs from having to go through the appeal process. There's no doubt that there are reasonable differences between the parties. There can be different reasonable differences as to whether a payment should be made or should not be made. The question is how do you get together to figure out whether it should be made? What is the procedure? Ms. Galati says it should not be cumbersome so that they have to keep going back and forth and it's not cost effective. So what's the situation? The first step, Your Honor, is for the state to be able to get this information. Right now it is only able to get that information after it has made the payment. What happens if you get that information? Once the state has the information, it can start evaluating what are the situations where valid claims are being denied. And then it can work with the HMOs and work with the FQHCs to make sure that those are kept to a minimum. Your Honor, the state has not been able to collect the information. It is trying to get it now post-payment. And that's what the plan was that was filed. If you had the information, you can go down the list and say this claim, the supplemental or wraparound is going to be denied in this case because, etc., etc. Right, so the state can look through and say, oh, in these cases the MCO denied it because it was not a valid Medicaid beneficiary, it's not a covered service, or in this case they should have paid it. So let's put some training out there, let's put a manual out there, let's put instructions out there so that the HMO understands what its obligations are and the FQHC understands its obligations. So the first step is to make sure that the information is available on a prepayment basis. You want to pay legitimate claims and they want to get paid for the services they provide. And the state absolutely recognizes that it has a responsibility to make sure that the FQHCs are paid for the valid services that they provide by the HMOs and that they receive supplemental payments. But the state also has a responsibility to the taxpayers to make sure that it's only paying what it is supposed to pay. Have you been, I think this is a rhetorical question, but you have not been to mediation on this, have you? I don't, no, I don't believe so. Ms. Brown, can we speak to you and Ms. Galati up here? Can I ask Ms. Simons to join me because she's the attorney who's representing them in the district. May I get the clerk's attention over here? Could you turn off the mic?